# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____ ___

|  |  |  |
|---|---|---|
| **ANTHONY FRANK PULEIO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **14-11750-FDS** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S
## MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM
## THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of a final decision of the Commissioner of the Social Security Administration denying an application for Supplemental Security Income ("SSI").  Plaintiff Anthony Frank Puleio appeals the Commissioner's denial of his claim on the grounds that the decision is not supported by substantial evidence of record under 42 U.S.C. § 405(g), and is incorrect as a matter of law, in violation of the Social Security Act, 42 U.S.C. § 401 *et. seq.*  He contends that the Administrative Law Judge ("ALJ") (1) failed to give appropriate weight to treating and examining medical source opinions; (2) ignored relevant evidence in weighing the treating and examining source opinions; (3) failed to evaluate Puleio's pain in accordance with 20 C.F.R. § 416.929 and SSR 96-7p; and (4) made an improper credibility determination that does not comply with SSR 96-7p and is not supported by substantial evidence.

Pending before the Court are Puleio's motion to reverse or remand the decision of the Commissioner, and the Commissioner's motion for an order affirming her decision. For the reasons stated below, the decision of the Commissioner will be affirmed.

## I.     Background

Anthony Puleio was born on May 8, 1966. (A.R. 121). He was 46 years old at the time of his hearing before the ALJ on July 3, 2012. (A.R. 36). Although there have been conflicting accounts of his completed level of education, Puleio testified at his hearing before the ALJ that he completed the eighth grade and quit school in the ninth grade. (*Id.*)

Puleio's occupational history has been sporadic. From 1980 to 1994, he held an unspecified number of "odd jobs" involving manual labor. (A.R. 137, 152-53). For about eight or nine months in 1998, he worked as a roofer for S.R.C. Roofing, Inc. (A.R. 137, 159-60). For about 40 days in 2006, he worked for Coca-Cola Refreshments USA Inc. loading trucks. (*Id.*). For about two months in 2008, he worked part-time at a supermarket deli counter. (A.R. 138, 159-63). For about one month in 2008, he worked part-time as a maintenance man at a nursing home, which is his last known place of employment. (A.R. 138, 159-62). Puleio testified that his family supported him while he was unemployed, and that he received additional financial assistance through state welfare and disability aid. (A.R. 37-38).

### A.     Medical History

On July 19, 2012, the ALJ found that Puleio suffered from the following severe impairments: (1) lumbar spine degenerative changes; (2) wrist and ankle arthritis status post surgeries; (3) chronic obstructive pulmonary disease ("COPD"); and (4) depressive and anxiety disorders and substance abuse. (A.R. 24). In addition, Puleio alleged disability due to bipolar disorder and sleep apnea. (A.R. 26). He reported that "pain, numbness, and shortness of breath

cause disabling-level difficulty with lifting, using his hands, sitting, standing, walking, bending, kneeling, squatting, and climbing stairs . . . ." (*Id.*).  He also reported that his mental symptoms, "including decreased energy and motivation, sleep disturbance [and] isolation, cause totally disabling difficulty with getting along with others and with memory, concentration, understanding, and following instructions." (*Id.*).

### 1. <u>Physical Impairments</u>

#### a. <u>Lumbar Spine Degenerative Changes</u>

On June 13, 2006, Puleio was admitted to the Cambridge Hospital Campus of the Cambridge Health Alliance ("CHA") for a period of six days after visiting the Somerville Emergency Room in a reportedly "paranoid state." (A.R. 275).  His chief complaints involved stress, anxiety, and depression. (*Id.*).  After admission he also reported intermittent back pain, allegedly due to a motor vehicle accident in 1997, which he reported had recently been aggravated by rolling out of bed. (A.R. 276*)*.  A physical examination in the psychiatric emergency services showed no significant physical findings. (*Id.*).  He was given Percocet and Ibuprofen to address the pain during his stay in the inpatient unit, and he was given a seven-day supply of Flexeril upon release. (A.R. 276, 279).  The risk of forming a dependency on the drugs and potential for abuse was noted in the discharge summary report and appears to have been discussed. (A.R. 277).

On November 3, 2008, Dr. Patrick Sabia of the Cambridge Health Alliance examined Puleio for reported pain in the left side of his back. (A.R. 331, 344).  Dr. Sabia became his primary-care physician at that time.  An examination of his lumbar spine revealed certain degenerative changes, including minimal anterior osteophytes at L4 and L5, as well as some narrowing of the T11-T12 disc space with some anterior osteophytes at the disc level. (A.R.

345-46).  Dr. Sabia noted that he exhibited "mild left sided paraspinal tend[erness] to palpation in lower lumbar spine," and characterized the back pain as chronic.  (A.R. 332).  He referred Puleio to physical therapy and recommended the use of over-the-counter medication.  (A.R. 332-33).

On December 21, 2008, Dr. Sabia conducted an additional examination of Puleio.  (A.R. 334).  He noted that Puleio had chronic obstructive pulmonary disease.  (*Id.*).  No medication was prescribed and Dr. Sabia suggested that he stop smoking.  (*Id.*).

On February 28, 2009, Dr. Monica Demasi examined Puleio for reported neck and upper-back pain.  (A.R. 425).  Puleio reported that the pain was due to a motor-vehicle accident that occurred on February 24, 2009.  (*Id.*).  Immediately following the accident, Puleio was reportedly given Percocet and Motrin for pain at the emergency department.  (*Id.*).  Radiological images of his neck showed no abnormalities.  (*Id.*).  Dr. Demasi made note of a message he received from Puleio's mother, alerting him to Puleio's drug-abuse problems and requesting that medical providers refrain from providing Puleio medication.  (*Id.*).  Dr. Demasi prescribed oxycodone-acetaminophen with no authorization for refill.  (*Id.*).

On March 9, 2009, Dr. Sabia again examined Puleio for neck and back pain associated with the motor-vehicle accident.  (A.R. 427).  X-rays revealed cervical arthritis and lumbar arthritis.  (*Id.*).  Dr. Sabia noted tightness in the paracervical muscles, but found that his strength in the upper extremities was normal.  (*Id.*).  Dr. Sabia also noted the need for physical therapy and his concerns regarding Puleio's potential drug abuse.  (*Id.*).

### b.   Wrist and Ankle Arthritis Status Post Surgery

On August 13, 2010, Dr. Sabia examined Puleio for shoulder and back pain, wrist pain, and anxiety.  (A.R. 437).  An x-ray of his wrist revealed osteochondroma, and Dr. Sabia referred

him to an orthopedic surgeon.  (*Id.*).  A shoulder examination revealed full range of motion and no pain on motion, but some muscle tenderness in the subscapularis muscle.  (*Id.*).  In the days following that examination, Puleio began physical therapy for left shoulder and scapular pain and it appears that he continued therapy for four weeks.  (A.R. 441-49).

In early October 2010, Puleio underwent arthroscopic surgery on his right ankle due to chronic pain and swelling.  (A.R. 451-52).  On November 5, 2010, he had a follow-up examination with Dr. Eric Launer.  (*Id.*).  Dr. Launer noted that Puleio reported that he had significant pain relief since the procedure; that he did not require the use of pain medications; and that he had decreased swelling in the ankle. (A.R. 455).  Dr. Launer also noted his "impression[s]" of Puleio's "status post ankle arthroscopy" and "debridement for advanced osteoarthritis of the ankle."  (*Id.*).

On November 15, 2010, Puleio was seen again by Dr. Launer, reporting intermittent pain in the right ankle and pain and weakness in the right wrist.  (A.R. 458).  Dr. Launer noted the following "impression" after examining Puleio:  "(1) [s]tatus post right ankle arthroscopy with some intermittent pain and advanced oseteoarthritis of the ankle posttraumatic[; and] (2) [r]ight wrist pain and weakness possibly due to a previous fracture versus a ganglion cyst."  (*Id.*).  On January 10, 2011, Puleio was seen again by Dr. Launer, reporting minor aches and pains in the right ankle and chronic wrist pain.  (A.R. 603).  Dr. Launer diagnosed "right ankle arthritis status post arthroscopy and chronic left wrist pain with degenerative joint disease."  (*Id.*).  Puleio was referred to Dr. Debra Mulley, an orthopedist, for further care and evaluation of his reported wrist pain.  (*Id.*).

On January 20, 2011, Dr. Mulley diagnosed Puleio with "left wrist radioscaphoid arthritis."  (A.R. 610).  Puleio elected to undergo surgery to relieve some of the discomfort.  On

May 11, 2015, Dr. Mulley performed a surgical excision of several osteophytic-like projections on his left wrist.  (A.R. 610, 664).

On September 15, 2011, Dr. Ralph Upchurch examined Puleio in the emergency room at Somerville Hospital for worsening pain and stiffness in his right ankle.  (A.R. 725).  Dr. Upchurch diagnosed post-traumatic arthritis in the right ankle, noted that a neurovascular check was normal, and provided Puleio with an Aircast ankle brace.  (*Id.*).  On October 5, 2011, Puleio returned to the emergency room at Somerville Hospital, complaining of continued right ankle pain.  (A.R. 723).  The examining physician noted some stiffness in the right ankle and no acute inflammation, which he felt was consistent with chronic post-traumatic ankle pain.  (*Id.*).

### c.   Chronic Obstructive Pulmonary Disease

A diagnosis of chronic obstructive pulmonary disease in Puleio was made as late as December 4, 2008.  (A.R. 27, 334).  In December 2008, he received a pulmonary function test that showed a $FEV_1$ of 3.69 with an FVC of 4.91.  (A.R. 606).[1]

On January 13, 2011, Puleio consulted Dr. Donald Kaplan regarding his reported history of shortness of breath.  (A.R. 605-06).  Dr. Kaplan suggested a repeat pulmonary function test to determine whether there had been any physiologic deterioration since the previous test conducted in December 2008.  (*Id.*).  Dr. Kaplan noted that the progression of Puleio's pulmonary symptoms was most likely due to chronic smoking.  He recommended that Puleio quit smoking, and he prescribed a nicotine patch and an Advair inhaler.  (A.R. 606).   A repeat pulmonary function test was obtained on February 22, 2011, and the results were "essentially normal,"

---

[1] The results of pulmonary function testing that are used for adjudication are reported in terms of $FEV_1$ (one − second forced expiratory volume) and FVC, (forced vital capacity).  20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, § 3.00, para E.  The "highest values of the $FEV_1$ and FVC . . . should be used to assess the severity of the respiratory impairment."  *Id.*

according to Dr. Kaplan.  (A.R. 648-50). [2]  On March 3, 2011, a chest x-ray revealed normal

pulmonary vascularity and no acute cardiopulmonary disease.  (A.R. 526).  Dr. Kaplan examined

Puleio again on March 31, 2011.  He noted that Puleio continued to smoke despite being advised

to stop, and that it appeared that he had significant exercise induced asthma.  (A.R. 616-17).  Dr.

Kaplan again advised him to stop smoking.  (A.R. 617).  On April 22, 2011, an exercise stress

test revealed no chest discomfort and no indication of ischemia.  (A.R. 482).

### d.   Sleep Apnea

On July 18, 2011, Puleio saw Dr. Muge Erkan after reporting difficulty sleeping.  (A.R.

739).  A sleep study was positive for obstructive sleep apnea and revealed a reduced sleep

efficiency of 75%.  (*Id.*).  Puleio was referred for CPAP titration, which is the usual first line of

therapy for obstructive sleep apnea.  (*Id.*).  A progress note from a May 23, 2012 pulmonary

follow-up examination of Puleio, which appears to have been conducted by nurse practitioner

Rogere Errie, indicates that while he started using the CPAP the previous November, he stopped

using it after about two months due to discomfort and a leak in the mask.  (A.R. 755).  Errie

noted that Puleio reported using the mask "4-5 hours at night on and off for about 2 months."

(*Id.*).  Errie reportedly stressed the importance of using the CPAP daily.  (*Id.*).

### 2.   Mental Impairments

On June 13, 2006, Puleio was admitted to the CHA Cambridge Hospital Campus, after

visiting the Somerville Emergency Room in a reportedly "paranoid state."  (A.R. 275).  He

complained of depression, anxiety, and insomnia following a breakup with his ex-girlfriend, who

is also the mother of one of his two children.  (A.R. 275-76).  He had reportedly been excessively

drinking for a number of weeks following the breakup, but had stopped approximately one week

---

[2] The pulmonary-function test occurred on February 22, 2011, and showed an $FEV_1$ of 3.86 and FVC of 4.91. (A.R. 27, 250).

prior to his admission.  (*Id.*).  According to the discharge summary report, Puleio had no prior history of acute medical issues and a physical examination and CT scan revealed no significant physical findings.  (A.R. 276).  An attending physician diagnosed "major depression with psychotic features (resolved)" among other findings, and provided seven day supplies of Celexa, Risperdal and Ativan for anxiety and psychiatric ailments.  (A.R. 278-79).  The risk of forming a dependency on the drugs and potential abuse was noted and appears to have been discussed.  (A.R. 277).

On December 21, 2008, Dr. Sabia examined Puleio and noted anxiety and depression and recommended counseling.  (A.R. 334).  On September 18, 2009, Dr. Demasi noted anxiety and trouble sleeping.  (A.R. 428).  On July 25 and August 29, 2011, Dr. Dmitriy Kireyev examined Puleio, after reportedly experiencing irregular heart palpitations associated with anxiety.  (A.R. 730-34).  Cardiac tests returned normal results and benign findings overall.  (*Id.*).

On October 19, 2011, Dr. Sabia diagnosed Puleio with "adjustment disorder with anxiety" and referred him to a psychiatrist.  (A.R. 710.).  On October 21, 2011, he received an initial psychiatric evaluation from Dr. Amanda J. Winters, and was prescribed new medication to minimize mood swings and treat his reported anxiety symptoms.  (A.R. 696-97).  Dr. Winters again evaluated him on November 11, 2011, for "continued supervision of mood disorder and substance dependence, [and] medication management." (A.R. 681).[3]  The primary diagnosis from the visit was a not-otherwise-specified mood disorder.  (*Id.*).  Dr. Winters also diagnosed alcohol dependence, cannabis dependence, nicotine dependence, and a non-specified anxiety disorder.  (*Id.*).  In addition, Dr. Winters noted that "[s]ome of his motivational problems could be due to ongoing cannabis use."  (*Id.*).  She further discussed the negative effects of cannabis

_____

[3] Portions of the SSA Administrative Record were out of order in their original form; the date of the examination is noted on A.R. 683.

with him and encouraged him to reduce or stop his use of the drug.  (A.R. 681-82).  An April 6,

2012 letter from Greg Kaufman, a substance abuse clinician with Somerville Mental Health

Association, indicates that Puleio began individual substance abuse counseling with Kaufman in

February 2012.  (A.R. 744).  Kaufman noted that he believed Puleio had been diagnosed with

major depressive disorder, a not-otherwise-specified anxiety disorder, and alcohol dependence in

full remission.  (*Id.*).

## B.   RFC Assessments

On February 25, 2011, Dr. Barbara Trockman completed a physical residual-functional-

capacity assessment concerning Puleio's back and right wrist pain.  (A.R. 474-81).  Dr.

Trockman concluded that he could lift and carry up to ten pounds frequently and twenty pounds

occasionally; he could sit for about six hours in an eight-hour workday; he could stand/ and or

walk for about six hours in an eight-hour workday; and he had a limited ability to push and/or

pull with his upper extremities.  (A.R. 475).  She also found that he had occasional postural

limitations, which were only frequent when stooping, and that he should avoid concentrated

exposure to machinery and heights, but that he was free of any other environmental limitations.

(A.R. 478).[4]

On June 3, 2011, Dr. Theresa Kriston completed a physical residual-functional-capacity

assessment concerning Puleio's osteoarthritis and COPD.  Dr. Kriston concluded that Puleio

could lift and carry up to ten pounds frequently and twenty pounds occasionally; he could sit for

about six hours in an eight-hour workday; he could stand/ and or walk for two to four hours in an

eight-hour workday; and he had a limited ability to push and/or pull with his upper and lower

extremities.  (A.R. 640).  She also found that he had occasional postural limitations; occasional

---

[4] "Postural limitations" are climbing, balancing, stooping, kneeling, crouching, and crawling. (A.R. 476).

manipulative limitations involving grasping and twisting with his left arm; and that he should avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, gases, poor ventilation, machinery, and heights.  (A.R. 643).

On May 10, 2012, Dr. Sabia completed a physical residual-functional-capacity questionnaire concerning Puleio's "asthma, ankle arthritis [status post] surgery, wrist arthritis, osteochondroma of wrist, alcohol abuse in *past*; [and] anxiety disorder."  (A.R. 749).  He noted that Puleio's prognosis was "fair-good."  (A.R. 749-53).  Dr. Sabia concluded that he could lift and carry up to twenty pounds occasionally; he could sit for less than two hours in an eight-hour workday; he could stand/ and or walk for about two hours in an eight-hour workday; and he had significant limitations in doing repetitive reaching, handling and fingering.  (A.R. 751-52).  Dr. Sabia also indicated that he needed to walk around every ten to fifteen minutes for twelve minutes, shift positions at will and take unscheduled breaks.  (*Id.*).  Dr. Sabia also noted that emotional factors contributed to the severity of Puleio's symptoms and functional limitations, and that he had a marked limitation in the ability to deal with work stress.  (A.R. 751).

On June 11, 2012, Dr. Donald Kaplan completed a sleep disorder residual-functional-capacity questionnaire concerning Puleio's COPD, exercise-induced bronchospasm, and obstructive sleep apnea.  (A.R. 773).  Dr. Kaplan found that his chronic fatigue and disturbance in cognitive function caused him several nonexertional limitations, including carrying out simple instructions, maintaining attention for two hour segments, dealing with normal work stresses, and maintaining socially appropriate behavior.  (A.R. 775-76).  He also noted that Puleio's prognosis was "fair."  (A.R.  775).

On June 11, 2012, Dr. Kaplan also completed a pulmonary residual-functional-capacity questionnaire concerning Puleio's COPD, exercise induced bronchospasm, and obstructive sleep

apnea.  (A.R. 778).  Dr. Kaplan found that his shortness of breath, episodic acute asthma, and fatigue were severe enough to frequently interfere with his concentration and attention.  (A.R. 778-79).  Dr. Kaplan also found that his ailments have left him severely limited in the ability to deal with work stress, and noted that he should avoid all exposure to extreme temperatures, fumes, odors, dusts, perfumes, cigarette smoke, and solvents or cleaners.  (A.R. 781).  Dr. Kaplan also noted that Puleio's prognosis was "guarded if [Puleio] continues to smoke."  (A.R. 780).[5]

### C.   Assessments of Mental Impairments

On February 16, 2011, Lisa Fitzpatrick, Psy.D. completed a psychiatric review technique form after reviewing Puleio's records.  (A.R. 460-73).  Dr. Fitzpatrick found that his mental impairments were not severe when he abstained from substance abuse and followed treatment recommendations, and that his functional limitations were mild.  (A.R. 460, 470).

On May 31, 2011, Jane Metcalf, Ph.D. completed a psychiatric review technique form concerning Puleio's anxiety related and substance addiction related mental disorders.  (A.R. 625-38).  Dr. Metcalf found that his "anxiety and adjustment difficulties in [the] setting of relapsing struggle with substances" were not severe.  (A.R. 625, 637).  She also noted that when sober, his functional limitations were mild; his anxiety responded to medications; and his "focus, memory and abilities to relate [were] adequate."  (A.R. 635, 637).

On June 1, 2012, Dr. Winters completed a "mental impairment questionnaire (RFC & listings)" concerning Puleio's not-otherwise-specified mood disorder, alcohol dependence in full

---

[5] The questionnaire completed by Dr. Kaplan is difficult to read.  However, there does not appear to be any dispute that it contains the quoted language.  In addition, the conditional language, "if [Puleio] continues to smoke," would make sense given Dr. Kaplan's concerns regarding Puleio's smoking habits that he noted in his letter to Puleio's primary care physician at the time regarding the results of his January 13, 2011 consultation with Puleio. (A.R. 606).  Similar concerns were noted in his March 31, 2011 progress note.  (A.R. 616-17).

remission, arthritis, and COPD.  (A.R. 767-71).  As to Puleio's prognosis, Dr. Winter's noted

that "due to relative resistance to medical therapy, [Puleio's] prognosis for full, sustained

recovery is guarded."  (A.R. 768).  Dr. Winters found the following clinical findings that she felt

demonstrated the severity of his mental impairments and symptoms: "inappropriate affect at

times (mood incongruent), irritability, dysphoria, difficulty sustaining attention."  (*Id.*).  She also

found that his mental impairments caused mild "restriction on activities of daily living;" marked

"difficulties in maintaining social functioning;" and marked "deficiencies of concentration,

persistence or pace resulting in failure to complete tasks in a timely manner."  (A.R. 770).  Dr.

Winters also noted that his "comorbid depression enhances perception of and ability to cope with

arthritis pain."  (A.R. 769).

## II.   **Procedural History**

Puleio applied for Social Security Disability Insurance ("SSDI") and Social Security

Insurance ("SSI") benefits on October 15, 2010, alleging a disability onset date of January 1,

1994.  (A.R. 121, 127).  The Acting Commissioner denied his applications on October 1, 2010.

(A.R. 70, 73).  He moved for reconsideration, and his applications were again denied on June 3,

2011.  (A.R. 76, 79, 82).  On July 14, 2011, he filed a request for an oral hearing, which was held

on July 3, 2012.  (A.R. 85, 32).  At the outset of that hearing, he amended his alleged disability

onset date to October 6, 2010.  (A.R. 35-36).  On July 19, 2012, the ALJ issued a decision that

dismissed the request for hearing as to SSDI benefits, in light of the amended alleged onset

date;[6] denied SSI benefits; and found he was not disabled from the amended alleged onset date

---

[6] The ALJ found that Puleio's earnings records showed that he had acquired sufficient quarters of coverage
to remain insured through March 31, 1997 (A.R. 21 (citing A.R. 139-42)).  Pursuant to 42 U.S.C. § 423, an applicant
must establish disability on or before his date last insured in order to be entitled to a period of disability and
disability insurance benefits. 42 U.S.C. § 423; (A.R. 21).  Therefore, by amending his alleged disability onset date
from January 1, 1994, to October 6, 2010, Puleio implicitly withdrew his SSDI application.  (A.R. 21, 35-36).
Furthermore, Puleio's attorney acknowledged his awareness of these implications at the hearing held on July 3,
2012.  (A.R. 35-36).

through the date of the decision.  (A.R. 21, 30).  On September 24, 2012, Puleio filed a request

for review by the Social Security Administration Appeals Council.  (A.R. 16).  On February 5,

2014, the Appeals Council denied the request for review, and the July 19, 2012 ALJ decision

became the final decision of the Acting Commissioner.  (A.R. 1).  On April 9, 2014, Puleio filed

the present action with this Court to review the decision of the Acting Commissioner pursuant to

42 U.S.C. § 405(g).  (Compl. at 1).

## III.    Analysis

### A.    Standard of Review

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the

Commissioner's decision, with or without remanding the case for a rehearing.  42 U.S.C. §

405(g).  The ALJ's finding on any fact shall be conclusive if it is supported by substantial

evidence, and must be upheld "if a reasonable mind, reviewing the evidence in the record as a

whole, could accept it as adequate to support his conclusion," even if the record could justify a

different conclusion.  *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st

Cir. 1981); *see also Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st

Cir. 1987).  In applying the "substantial evidence" standard, the Court must bear in mind that it is

the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences

from the record, and resolve conflicts of evidence.  *Ortiz v. Sec'y of Health and Human Servs.*,

955 F.2d 765, 769 (1st Cir. 1991).  Reversal is warranted only if the ALJ committed a legal or

factual error in evaluating plaintiff's claim, or if the record contains no "evidence rationally

adequate . . . to justify the conclusion" of the ALJ.  *Roman-Roman v. Comm'r of Soc. Sec.*, 114

Fed. Appx. 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health and Human*

*Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).  Therefore, "[j]udicial review of a Social Security Claim is

limited to determining whether the ALJ used the proper legal standards, and found facts based on

the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir.

2000). Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*.

*Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001).

### B.   Standard for Entitlement to Supplemental Security Income Benefits

An individual is not entitled to SSI benefits unless she is "disabled" within the meaning

of the Social Security Act. *See* 42 U.S.C. §§ 1382(a)(1), 1382c(a)(3) (setting forth the definition

of "disabled" in the context of SSI). "Disability" is defined, in relevant part, as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

1382c(a)(3)(A). The impairment must be severe enough to prevent the claimant from

performing not only his past work, but any substantial gainful work existing in the national

economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.960(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the

regulations promulgated under the statute, and administered by the Commissioner. *See Mills v.*

*Apfel*, 244 F.3d 1, 2 (1st Cir. 2001); C.F.R. § 416.920. The steps are:

> 1) If the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the application does not have, or has not had . . . a severe impairment
> or combination of impairments, the application is denied; 3) if the impairment
> meets the conditions for one of the 'listed impairments' in the Social Security
> regulations, then the application is granted; 4) if the applicant's 'residual functional
> capacity' is such that [s]he . . . can still perform past relevant work, then the
> application is denied; 5) if the applicant, given his or her residual functional
> capacity, education, work experience, and age is unable to do any other work, the
> application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 416.920(a)(4). The burden of proof is on the applicant as

to the first four steps of the analysis. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be

considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."); *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step of the analysis, the burden shifts to the Commissioner to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman*, 274 F.3d at 608; *see Goodermote v. Sec'y of Health and Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982). In making this determination, the ALJ must assess the claimant's residual functional capacity ("RFC") in combination with vocational factors, including the claimant's age, education and work experience. 20 C.F.R. §§ 416.920(g), 416.960(c).

### C.    The ALJ's Findings

In evaluating the evidence, the ALJ conducted the five-part analysis called for by Social Security Act regulations. (A.R. 24-30). First, the ALJ concluded that Puleio had not engaged in substantial gainful activity during the period from October 6, 2010, his amended alleged onset date, through July 19, 2012, the date of the decision. (A.R. 24). Secondly, the ALJ addressed the severity of Puleio's impairments. C.F.R. § 416.920(c); (*Id.*). The ALJ concluded that he had the following severe impairments: (1) lumbar spine degenerative changes; (2) wrist and ankle arthritis status post surgeries; (3) chronic obstructive pulmonary disease; (4) depressive and anxiety disorders; and (4) substance abuse. (A.R. 24). In addition, the ALJ concluded that Puleio's sleep apnea was non-severe because "the medical record contains no evidence of any non-routine ongoing treatment for or ongoing observed signs and symptoms from this condition," and it would not have more than a minimal effect on his ability to work. (*Id.*). Although Puleio was diagnosed with sleep apnea in 2011 and reported fatigue as of 2012, the ALJ found that he had not been using his CPAP machine as prescribed. (*Id.*).

Thirdly, the ALJ determined whether Puleio's severe impairments met or medically equaled the severity of one of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1; *see also* 20 C.F.R. §§ 416.920(d), 416.925, 416.926; (A.R. 24). She concluded that the medical record did not contain the required objective signs, symptoms, findings, or degree of functional restriction necessary to show that his severe back, joint, and pulmonary impairments met the severity levels under §§ 1.00 and 3.00 of 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1; A.R. 24). She found that his impairments did not involve an "inability to ambulate effectively, inability to perform fine and gross movements effectively, evidence of spinal nerve root compression with motor loss, or chronic obstructive pulmonary/ ventilator disease with diagnostic testing values as set forth in listing 3.00." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1; (A.R. 24). She further found that "treating and examining sources repeatedly observed normal strength, grip, sensation, and gait and diagnostic pulmonary testing revealed values well over [§] 3.00." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. [7]; (A.R. 24)

As for Puleio's mental impairments, the ALJ found that his variously diagnosed depressive, anxiety, and mood disorders, considered singly and in combination, were insufficient to meet the requirements of the listed impairments in §§ 12.04, 12.06 and 12.09 in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (A.R. 25). She found that although Dr. Winters indicated findings of decreased attention, the treatment records do not contain objective mental status findings or

---

[7] As to "values well over [§] 3.00," 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A §§ 3.02(A)-(B) provide tables containing severity-threshold measurements for chronic obstructive pulmonary/ ventilator disease, based upon FEV1 and FVC measurements in relation to the subject's height and weight. (*Id.*). The subject's impairment qualifies if his or her FEV1 or FVC is equal to or less than the values provided in Table's I and II. The highest value for FEV1 provided in Table I is 165L, and the highest value for FVC provided in Table II is 1.85L. (*Id.*). In plaintiff's case, diagnostic testing in 2008 showed an FEV1 of 3.69L and an FVC of 4.91L. Diagnostic testing in 2011 revealed changes that were "essentially normal" with an FEV1 of 3.86L and an FVC of 4.96L. (A.R. 27, 250, 606).

cognitive testing.  (A.R. 28).   She further found that Puleio had "no more than mild restriction" as to "activities of daily living," as he reported performing various activities despite an alleged decreased level of energy and motivation.  (*Id.*).  She also found "no more than moderate limitation" as to "social functioning," and that he could "otherwise perform at least the basic social demands of unskilled work."  (*Id.*).  Regarding "concentration, persistence, or pace," the ALJ found that he had "no more than moderate limitation . . . and [could] otherwise perform at least the basic mental demands of unskilled work."  (*Id.*).  The ALJ also found that the medical record contained "no evidence of any partial or inpatient psychiatric hospitalizations since 2006" and no "episodes of decompensation, which [had] been of extended duration."  (A.R. 29).  The ALJ also noted that the medical record showed ongoing drug use through at least 2011.  (*Id.*)

At the fourth step, the ALJ considered Puleio's RFC and past relevant work.  (A.R. 25-29).  She found that he had the RFC to perform sedentary work as defined in 20 C.F.R. 416.967(a) except for certain limitations.  (A.R. 25).  The ALJ found that he was limited to sedentary work involving "occasional grasping, twisting, pushing, and pulling with the left upper extremity, no foot controls with the right lower extremity; occasional balancing, stooping, kneeling, crouching, crawling, and climbing, but no climbing ladders/ropes/scaffolds."  (*Id.*). She also found that he "must avoid concentrated exposure to temperature extremes, pulmonary irritants, and hazards and is limited to no more than occasional interaction with the public and no more than simple routine tasks with occasional decision-making and work place changes."  (*Id.*). Based on the conclusion that Puleio is limited to sedentary work, the ALJ found that he was unable to perform any past relevant work as a construction worker, truck loader, maintenance worker or deli slicer.  (*Id.*).

Finally, at the fifth step, the ALJ concluded that jobs exist in the national economy in significant numbers that Puleio can perform.  (A.R. 30).  The ALJ expressly relied on the vocational expert's testimony at the hearing that an individual of Puleio's age, and with his education, work experience, and residual functional capacity, would be able to work as a die loader, a laminator, or a bonder, and that jobs exist in each of these categories in the national economy in significant numbers. (*Id.*).  The ALJ stated that she verified that the vocational expert's testimony was consistent with the information provided in the Dictionary of Occupational Titles.  (*Id.*).  The ALJ thus concluded that Puleio is not disabled under section 1614(a)(3)(A) of the Social Security Act. (*Id.*).

**D.    Puleio's Objections**

Puleio raises four objections to the ALJ's findings.  He contends that the ALJ (1) failed to give appropriate weight to the treating and examining medical source opinions; (2) ignored relevant evidence in weighing the treating and examining source opinions; (3) failed to evaluate his pain in accordance with 20 C.F.R. § 416.929 and SSR 96-7p; and (4) made an improper credibility determination that does not comply with SSR 96-7p and is not supported by substantial evidence.

**1.    Weight Given to Treating and Examining Medical Source Opinions**

Puleio contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to give controlling weight to the findings of his treating physicians.  He contends that the ALJ "dismissed the opinion evidence" of Dr. Patrick Sabia, Dr. Donald Kaplan, and Dr. Amanda Waters and gave undue weight to the opinions of the state agency physicians.  He notes that the state agency physician reviews had been conducted in the winter and spring of 2011, while the opinions of the treating physicians had been conducted in

the spring of 2012.  He further contends that the treating physician reviews more properly accounted for the changes in his medical issues prior to the oral hearing before the ALJ held on July 3, 2012.  He also contends that the ALJ erred by failing to "discuss the length of treatment relationship or specialization of the three treating MDs."  (Pl. Brief at 12).  Moreover, Puleio contends that the ALJ erroneously found that "none of the [three treating physician's] opinions were based on objective medical findings," because her definition of "objective findings" went beyond what should be required under the definition of "signs" provided in the regulations.  (Pl. Brief at 12-13 (quoting the definition of "signs" found in 20 C.F.R. § 404.1528(b)).

An ALJ's determination of a claimant's RFC must be supported by substantial evidence. *Seavey*, 276 F.3d at 10.  Substantial evidence is defined as "more than a mere scintilla" of evidence, such that a reasonable mind could accept the evidence as providing "adequate to support" for the ALJ's conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In making an RFC determination, the opinions of a treating source may be given controlling weight if "the treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007); 20 C.F.R. § 404.1527(c)(2). Nevertheless, "the law in this circuit does not require [an ALJ] to give greater weight to the opinions of treating physicians, as she is granted discretion to resolve any evidentiary conflicts of inconsistencies."  *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014) (quoting *Arroyo v. Sec'y of Health and Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)).

When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight to give the opinion based on factors that include (1) the length of the

treatment relationship; (2) whether the treating source provided evidence in support of the opinion; (3) whether the opinion is consistent with the record as a whole; and (4) whether the treating source is a specialist.  20 C.F.R. § 404.1527(c).  The ALJ must "give good reasons in her notice of determination or decision for the weight [she gives] treating source's opinion," and should not discount that opinion entirely.  *Id.*  However, opinions that a claimant is "disabled or unable to work" are legal conclusions "reserved to the Commissioner because they are administrative findings that are dispositive of a case."  20 C.F.R. § 404.1527(d)(1).

### a.   Dr. Sabia and Dr. Kaplan — Physical Impairments

The ALJ did not give controlling weight to either Dr. Sabia's or Dr. Kaplan's opinion because their findings regarding the nature and severity of Puleio's impairments were inconsistent with substantial evidence elsewhere in the administrative record.  *Conte*, 472 F. Supp. 2d at 48; *see* 20 C.F.R. § 404.1527(c)(2); (A.R. 24-28).  The ALJ reasoned as follows:  (1) "the objective medical evidence showed essentially normal pulmonary function testing and normal strength, sensation, and gait aside from some pain[;]" (2) "despite [his] pain . . . [Puleio] reported still performing various activities[;]" (3) despite "some pain that could interfere with concentration and dealing with work stress, there [were] no objective findings of any ongoing decreased concentration or cognitive testing[;]" and (4) "the medical record also show[ed] concurrent drug use through at least 2011."  (A.R. 28).  The ALJ found that the foregoing evidence did not "support [an] inability to sit, stand, and walk in combination for at least [eight] hours or [the assertion] that he would require such considerable breaks or absences," as Dr. Sabia had determined in his May 10, 2012 physical RFC questionnaire.  (A.R. 28, 751-52).  The ALJ further found that because "the objective medical evidence show[ed] essentially normal pulmonary function testing in terms of [Puleio's] COPD and that he [was] not using his CPAP as

prescribed for sleep apnea . . . the severity of Dr. Kaplan's limitations in the sleep/pulmonary questionnaires," which were similar to those found by Dr. Sabia, were largely unsupported. (A.R. 27).  Substantial evidence supports those determinations.

After two RFC assessments completed in February and June 2011, Dr. Trockman and Dr. Kriston concluded that Puleio could sit for about six hours in an eight-hour workday.  (A.R. 27, 475, 640).  Dr. Trockman found that he could stand/walk for about six hours in an eight-hour workday, given his back and wrist pain, and Dr. Kriston found that he could stand/walk for two-to-four hours in an eight-hour workday, given his osteoarthritis and COPD.  (A.R. 475, 640).  Those opinions indicated that Puleio could perform "less than light exertion."  (A.R. 27).   The record contained sufficient objective findings showing otherwise normal strength, sensation, gait and essentially normal pulmonary function testing, which were sufficient to provide adequate support for the ALJ's determination that Puleio could perform at least that level of exertion and non-exertional activities.  *See Richardson*, 402 U.S. at 401; (A.R. 27, 648-50, 526).

The ALJ did not give controlling weight to Dr. Sabia's opinion concerning the interplay between physical pain and anxiety on the ground that his findings were inconsistent with substantial evidence elsewhere in the administrative record.  (A.R. 28).  The ALJ reasoned that while Puleio had some pain and mental impairments that could interfere with his concentration and ability to handle work stress, Puleio reported performing various activities and there were no objective findings of any ongoing decreased concentration or cognitive testing.  (*Id.*).  The ALJ also noted that the medical record showed concurrent drug use, which did not support the severity of Dr. Sabia's opinion in terms of frequent interference with concentration and marked limitation to deal with work stress.  (*Id.*).  The ALJ further found that while Puleio had some

pain, he also had normal strength, sensation, and gait and was performing various activities. (*Id.*).  Substantial evidence supports those determinations.

### b.   Dr. Winters — Mental Impairments

The ALJ did not give controlling weight to Dr. Winter's opinion concerning Puleio's mental impairments for the following reasons: "[it was] inconsistent with [Puleio's] own reports of performing various activities despite his mental impairments, the medical record contain[ed] few abnormal objective mental status findings and show[ed] concurrent drug abuse through at least late 2011, and [there was] no evidence of partial or inpatient psychiatric hospitalizations since 2006."  (A.R. 29).

The ALJ found that "[Puleio had] no more than mild restriction because of mental symptoms" as "he reported performing various activities including cooking, housework, shopping, occasional driving, and talking on the telephone." (A.R. 28).  According to the ALJ, those activities all "require a considerable degree of concentration" and thus found that the record did not substantiate Dr. Winter's opinion.  (A.R. 29).  The ALJ further found that while Puleio suffered from varying moods, his social functioning level was sufficient to perform at least basic social demands of unskilled work.  (*Id.*).  The ALJ also noted that he had the requisite "concentration, persistence, or pace" to complete "simple unskilled tasks."  (*Id.*).

### 2.   Whether the Decision is Supported by Substantial Evidence

Puleio contends that the ALJ's determination was not supported by substantial evidence because she ignored his testimony relating to daily activities and mischaracterized relevant evidence regarding those activities.  He further contends that the ALJ incorrectly relied on his reports of cooking, performing housework, shopping, occasional driving, talking on the phone, and being able to handle money as substantial evidence that he could work a full-time job.  He

notes that his ability to perform those activities does not support the ALJ's finding that he could perform the jobs identified by the vocational expert, as he has concentration limitation, and production and pace deficiencies.

The "substantial evidence" standard is one where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Miranda v. Sec'y of Health, Ed. and Welfare*, 514 F.2d 996, 998 (1st Cir. 1975); *Sousa v. Astrue*, 783 F. Supp. 2d 226, 232 (D. Mass. 2011). Accordingly, the ALJ must review all the relevant evidence. *Sousa*, 514 F.2d at 232; SSR 06-03p, 2006 WL 2329939, at *6. However, the ALJ is not required to discuss every piece of evidence in the record when making his or her decision. *Santiago v. Sec'y of Health and Human Servs.* 46 F.3d 1114 (1st Cir. 1995); *Sousa*, 783 F. Supp. 2d at 234 ("The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in the record."). Moreover, even if one could come to a different conclusion than the ALJ, the question on judicial review is whether substantial evidence supports the ALJ's decision. *Robles v. Barnhart*, 2005 WL 1773963 at *4 (D. Mass. 2005) ("If substantial evidence exists to support the ALJ's determination, the Court must accept his findings as conclusive even if the record arguably could justify a different conclusion."). A reviewing court may reverse or remand the ALJ's decision when the ALJ ignored evidence, or made legal or factual errors. *Moore v. Astrue*, 2013 WL 812486 at *2 (D. Mass. 2013); *Robles*, 2005 WL 1773963 at *4. As for the RFC, the RFC assesses what a claimant "can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416. 945(a). The claimant has the burden of providing evidence to establish how her impairments limit her RFC. *Freeman*, 274 F.3d at 608. As stated, an applicant has the burden of production and proof at the fourth step, which includes the assessment of the applicant's RFC. *Id.* However, the ALJ maintains the duty to determine a claimant's RFC based

upon the entire record.  *See* 20 C.F.R. §§ 404.1545, 404.1546.  In assessing an RFC, the ALJ can

"piece together the relevant medical facts from the findings and opinions of multiple physicians."

*Evangelista*, 826 F.2d at 144.

In assessing Puleio's RFC, the ALJ relied on several professional observations, tests, and

opinions.  *See Evangelista*, 826 F.2d at 144; (A.R. 24-28).  The ALJ noted that while there was

evidence of degenerative changes in his lumbar spine, residual ankle pain and stiffness, and wrist

surgery in May 2011, his medical records repeatedly observed normal strength, sensation, and

gait, and his diagnostic studies revealed no evidence of spinal cord or nerve root involvement.

(A.R. 26-27).  The ALJ further noted that although Puleio was diagnosed with COPD, the results

of his pulmonary function test from 2011 were normal and showed a significant response to a

bronchodilator.  (A.R. 27).   The ALJ also determined that Puleio's activities and own testimony

contradicted his "subjective allegations of disabling physical and mental symptoms," as he was

able to cook, do housework, shop, occasionally drive, talk on the telephone, and handle money.

(*Id.*).  The ALJ's determination that these admissions undermined his subjective allegations is

reasonable, as the evidence on record provides adequate support.  *See Richardson*, 402 U.S. at

401; (A.R. 168-82, 201-216).

Although it is true that the ALJ did not use all of the factors provided in 20 C.F.R. §

404.1527 and 416.927, remand based on this failure alone is not warranted as this Court finds

that her reasoning was sufficiently clear and supported by substantial evidence.  *See*, e.g.,

*Morales v. Comm'r of Soc. Sec.*, 2 Fed. Appx. 34, 36 (1st Cir.2001) (upholding ALJ's rejection

of treating-physician RFC assessments that were not corroborated by clinical studies or findings

and were refuted by rest of record evidence).

### 3.   Credibility Determination as to Subjective Pain Allegations

Finally, Puleio contends that the ALJ failed to evaluate his pain in accordance with 20 C.F.R. § 416929 and SSR 96-7p, and that she made an improper credibility determination by finding his subjective allegations of pain not credible.  He contends that the ALJ improperly rejected his subjective allegations of pain solely because they conflicted with the objective medical evidence, rather than conducting an *Avery* analysis to consider the pain's location, intensity, and other limiting symptoms.

The ALJ is responsible for deciding "issues of credibility" and drawing "permissible inference[s] from evidentiary facts." *Rodriguez*, 647 F.2d at 222 (quoting *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965)).  Furthermore, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference . . . ." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *DaRosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)).  An ALJ may find that a claimant's testimony is not credible if the ALJ supports such a conclusion with "substantial evidence" and makes specific findings as to the "relevant evidence" considered in coming to that conclusion.  *DaRosa*, 803 F.2d at 26.

In evaluating a plaintiff's credibility, the alleged functional limitations and restrictions due to symptoms must be reasonably consistent with medical evidence and other evidence, including statements and reports by the claimant and treating sources.  20 C.F.R. § 404.1529.  Factors that should be considered in assessing the severity of claimant's complaints of pain include daily activities; location, duration, frequency, and intensity of symptoms; type, dosage, effectiveness, and side effects of medication; and treatment or any other measures used to relieve

symptoms.  *See also Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986); 20 C.F.R. § 404.1529.  However, an ALJ is not required to discuss specifically all those factors in making a decision. *Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010).

Here, the ALJ found that "[Puleio's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [ . . . ] residual functional capacity assessment.  (A.R. 26).  The ALJ considered and discussed the *Avery* factors and requirements of C.F.R. 416929 at the hearing and in her written decision. In her decision, the ALJ noted that Puleio's claims regarding his inability to work were inconsistent with the objective medical evidence and the record as a whole.  (A.R. 25-26).  She found that his claims of disability did not align with the medical evidence that showed normal grip strength and sensation, and normal diagnostic pulmonary function along with significant response to bronchodilator.  (A.R. 26).  The ALJ also found that Puleio's ability to cook, do housework, shop, drive, talk on the phone, and handle money do not support his subjective allegations of totally disabling physical and mental symptoms.  (A.R. 27.)  The ALJ thus sufficiently explored the *Avery* factors and made a credibility determination that was adequately supported by references to the medical record and Puleio's own testimony.

## IV.   Conclusion

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 29, 2015

26